In the matter of the Estate of JOHN K. HARTT, Deceased, CLARENCE A. BRIMMER and ROBERT BIBLE, Executors of the Estate of JOHN K. HARTT, Deceased; CLARENCE A. BRIMMER and ROBERT BIBLE, as designated Trustees under the Last Will and Testament of JOHN K. HARTT, Deceased; and MARJORIE HIGLEY,

*Appellants,*

vs.

PEARL HARTT, PEARL HOLMQUIST, MARIE HARRISON, FRANCES LOUISE MITCHELL, CATHERINE KEFFELER and DOROTHY OKEY,

*Respondents.*

PEARL HARTT,

*Plaintiff and Respondent,*

vs.

CLARENCE A. BRIMMER and ROBERT BIBLE, Executors of the Estate of JOHN K. HARTT, Deceased; CLARENCE A. BRIMMER and ROBERT BIBLE, as designated Trustees under the Last Will and Testament of JOHN K. HARTT, Deceased,

*Defendants and Appellants,*

PEARL HOLMQUIST, MARIE HARRISON, FRANCES LOUISE MITCHELL, CATHERINE KEFFELER and DOROTHY OKEY,

*Defendants and Respondents,*

and

MARJORIE HIGLEY,

*Defendant and Appellant.*

(Nos. 2684 and 2685; April 10th, 1956; 295 Pac. (2d) 985)

See also 74 Wyo. 356, 287 P.2d 645.

For the appellants Brimmer and Bible, as executors, in each case, the causes were submitted upon the brief of Clarence A. Brimmer, Jr., of Rawlins, Wyoming, and Lathrop & Lathrop of Cheyenne, Wyoming, and oral argument by Mr. Carleton A. Lathrop and Mr. Clarence A. Brimmer, Jr.

For the appellant Marjorie Higley in each case, the causes were submitted upon the brief of Smith & Nicholas of Lander, Wyoming, and oral argument by Mr. W. A. Smith.

For the respondents in each case, the causes were submitted upon the brief of Pence & Millett of Laramie, Wyoming; Senior & Senior of Salt Lake City, Utah; and Johnson & Miles of Rawlins, Wyoming; and oral argument by Mr. Alfred M. Pence and Mr. George J. Millett.

314

320

322

324

## OPINION

BLUME, Chief Justice.

John K. Hartt of about 78 years of age, hereinafter named generally as the testator, made his last will and testament on March 14, 1951. We shall set out only the essential parts involved in this case. In paragraph 3 he provided:

"I give, devise and bequeath all of my property, real, personal and mixed, whereof I may die seized or possessed, wheresoever situate and of whatsoever kind, after the payment of all of my just debts, expenses of administration and the family allowance, as follows, to-wit:"

He then devised certain real estate consisting of the home in Rawlins and an adjoining tract of land to his wife, Pearl Hartt of about the age of 72 or more, and he devised other real estate to his six daughters, namely, Pearl Holmquist, Marie Harrison, Marjorie Higley, Frances Louise Mitchell, Katherine Keffeler, and Dorothy Hartt.

In paragraph 4 of his will, he provided:

"All of the rest, residue and remainder of my estate, being all of the balance of my said estate, to Clarence A. Brimmer and Robert Bible, all of the City of Rawlins, County of Carbon, State of Wyoming, to have and to hold the same, they, their heirs and assigns, in trust—nevertheless, for the uses and purposes, with the powers and in the manner hereinafter mentioned, namely, to-wit:

"(a)   I hereby authorize, empower and direct the said trustees above named, and their survivors and successors, to adjust and settle all accounts and transactions relating to my business or investments; to leave my said estate, real, personal and mixed, invested as it then is at the time of my decease, or, should they deem it for the best interests of my estate, to lease, mortgage, sell or dispose of any or all of said estate, real, personal or mixed, whatsoever or wheresoever, either by public or private sale, for the best prices that can be obtained for the same, and by proper deed or deeds, mortgage or mortgages, conveyances or assurances in the law, to be duly executed, acknowledged and perfected by them, to grant, convey and assure the same to the purchaser or purchasers thereof; to invest the proceeds thereof in stocks or bonds or put the same out on interest at good security, or invest in such other manner as they may deem best, and they shall not be liable for any shrinkage in value by reason of the exercise of the discretion thereby reposed in them.

"(b)   I do further authorize, empower and direct the said trustees and their survivors and successors to appropriate the net annual income of my said trust estate to the support of my wife during her lifetime; said monies to be appropriated for that purpose from time to time at regular intervals;

"(c)   And I do further authorize, empower and direct the said trustees above named, and the survivors and successors of the said trustees, in case they shall deem it expedient and necessary, to appropriate the whole or any part of the principal of my said estate, real, personal or mixed, to the maintenance and support of my said wife."

He further provided that upon the death of his wife, if she should survive him, the income from the estate then remaining should be paid over to his six daughters in equal shares and that the principal of the estate then remaining should be paid over to these six daughters after the expiration of eight years. In paragraph 8 of his will, Mr. Hartt provided as follows:

"I do nominate, constitute and appoint Robert Bible and Clarence A. Brimmer, to be the executors of this my Last Will and Testament, reposing full confidence in their integrity and ability to perform the trusts thus committed to them. I do further direct that the said executors complete their administration of the said estate as soon as possible, in order that it may vest in them as trustees as aforesaid, by due process of law."

Robert Bible, named as one of the executors in the will above mentioned, has been admitted to practice law in this state but in the main he is a banker and president of the First National Bank at Rawlins, Wyoming. Clarence A. Brimmer is an attorney at law, having practiced for approximately forty years. The pleadings and testimony in this case show: "That for many years prior to the death of John K. Hartt, Clarence A. Brimmer as his attorney and Robert Bible as his financial adviser, consulted with and advised the testator in practically all of his legal and financial problems and assisted him in the determination of policy and management of the Cow Creek and Pioneer Sheep Companies as well as other interests of the decedent and devoted all the time necessary for such purpose." It is further shown by the testimony that both Bible and Brimmer had large experience in connection with livestock companies. The personal property left by the deceased was valued at more than $800,000 and consisted mainly of the controlling stock in three sheep companies, namely, Yellowstone Sheep

Company, Cow Creek Sheep Company and Pioneer Sheep Company.

John K. Hartt died on July 14, 1952. His funeral was held on July 16, 1952, after which a meeting was held at the home of the testator and his widow, Pearl Hartt. There were present at that time the widow and five of the daughters of the testator as well as Robert Bible and Clarence A. Brimmer. The will of the testator was read and Robert Bible gave a synopsis of the property which was left by the testator. The will was duly admitted to probate in the district court of Carbon county, Wyoming, on August 14, 1952, and Bible and Brimmer were duly appointed as executors. All of the beneficiaries of the will were apparently satisfied with the will of the testator for approximately a year. But in the fall of 1953 after consultation with counsel, Pearl Hartt commenced an action in equity to permit her to dissent from the will of testator, although at that time the statutory period permitting her to dissent had expired. Mrs. Hartt and five of her daughters also commenced an action to remove the executors appointed in the will. Mrs. Hartt also set out another cause of action in which she claimed she was entitled to her statutory share of the estate, that is to say one-half thereof as well as that provided in the will. These causes of action were consolidated by the court for trial and we shall consider them together in the order named. All these causes or proceedings have been argued in great detail and extensively by counsel on both sides. We have for instance before us one of the briefs in connection with two of these cases on the part of counsel for Mrs. Hartt and her daughters consisting of 300 closely printed pages and citing us to approximately 300 authorities. In view of the minute and extensive briefs in the case, we feel compelled, much against our will, to make our opinion in these cases somewhat exhaustive, following the foot-

steps of counsel in these cases. We must apologize for the length of the opinion but the questions involved are new and important.

I. Right of Widow To Dissent From Will After Statutory Time.

The action in equity heretofore mentioned to permit the widow to dissent from the will was brought by Pearl Hartt, widow of testator, on November 4, 1953. She alleged in substance that she did not know of her right to elect to take against the will of the deceased; that she did not know the extent and value of the estate; that she was ignorant of the impact of Federal taxes on the estate; that she was not advised of her rights by the executors of the estate in whom the testator and plaintiff had reposed trust and confidence, nor was she advised of her rights by any one else. All of the daughters of testator and Pearl Hartt, except Marjorie Higley, filed their answer admitting the allegations of the petition, and consented to the court granting the relief prayed. Marjorie Higley, a daughter, and the executors answered and in substance denied the right of the widow to dissent from the will after the expiration of the time fixed by statute. For convenience, Pearl Hartt and the daughters joining her in her petition will frequently be referred to as respondents.

The court, by decree dated July 16, 1954, granted the widow the right to elect to take against the will, which she did on July 20, 1954. From the decree Marjorie Higley and the executors have appealed.

The statute, ] 6-301 W.C.S. 1945, so far as applicable here, reads as follows:

"Any person of full age and sound mind, may dispose by will of all his property except what is sufficient to pay his debts, or what is allowed by law to husband

and family or wife and family; provided, however, that in case any married person shall hereafter by will deprive his or her husband or wife of over one-half of his or her property remaining after the payment of his or her debts, it shall be optional with the surviving spouse after the death of the testator or testatrix to accept the condition of such will or one-half of the estate, real and personal, of the deceased spouse. Such option shall be signified by an instrument in writing, signed by the surviving spouse and acknowledged before some officer authorized by the laws of this state to take acknowledgments, and filed in the office of the clerk of the district court in which such will is admitted to probate within six (6) months after the probate thereof. In default of the filing of such instrument duly executed and acknowledged as aforesaid within said period of six (6) months, the will shall govern and control in the distribution of the testator's estate * * *."

The question before us is as to whether or not Mrs. Hartt, the widow, has a right to elect not to take under the will, when she did not do so within six months after the probate of the will, and have relief in an action in equity. The case is one of first impression in this court, and is, on account of future cases, of utmost importance. It is stated in Annotation, 81 A.L.R. 757, that the authorities on the question are in conflict, without pointing out the reasons for conflict. The decisive decisions on the point, pro and con, are absolutely irreconcilable, although we have diligently sought some ground on which they could be reconciled. The reasons for the irreconcilability will be pointed out later. There are but few points on which the courts are generally agreed, namely, when fraud and the like appear by reason of which the widow has been silent, relief may be granted, for fraud vitiates everything. No fraud or the like appears in the case at bar. So, too, the courts hold that if the widow wants to change her mind during the period fixed in the statutes, she may do so. See cases cited in In re Zweig's Will,

145 Misc. 839, 261 N.Y.S..400, 419. There also may be very exceptional circumstances under which the time fixed by statute is not controlling. Mann v. Peoples-Liberty Bank & Trust Co., Ky., 256 S.W.2d 489. Counsel for respondents think that we have in principle decided in favor of their contention in Merrill v. District Court of Fifth Judicial Dist., 73 Wyo. 58, 272 P.2d 597. We there relieved a party from default in a procedural matter and stated that courts have inherent power to relieve parties from default, which, of course, is true in so far as procedural matters are concerned. But that case involves a substantive, a property right, and a method of acquiring property, and the case has no bearing herein. A number of other cases, cited by counsel for respondents, are not in point herein. Thus New Mexico and Oklahoma have no statute fixing the time in which an election must be made. In re Woolley's Estate, 96 Vt. 60, 117 A. 370, and Hathaway v. Hathaway, 44 Vt. 658, are not in point for the reason that the statute expressly authorized the court to extend the time without apparently fixing any limit to that time. That appears to be true also in the case of Town of Raymond v. Goodrich, 80 N.H. 215, 116 A. 38. See Revised Statutes, New Hampshire, 1942, p. 1542, ] 14. The Kansas and Ohio cases cited may be distinguished by reason of the fact that there the probate court is required to explain to the widow her right of election against the will. Porter v. Spring, 250 Mass. 83, 145 N.E. 52, is distinguishable because there the surviving spouse filed an election both under and against the will by mistake. Primeau v. Primeau, 317 Mo. 828, 297 S.W. 382, too, is distinguishable because it involves the election by an insane person. Nor does Waggoner v. Waggoner, 111 Va. 325, 68 S.E. 990, 992, 30 L.R.A. (N.S.) 644, from which counsel quote at length, support the position that the widow in this case should be permitted to now elect against the

will. In that case the husband undertook to devise property to the widow which belonged to her, and for that reason the court held that the statute limiting the time in which she might elect was not applicable. See comment on that case in 2 Pomeroy's Equity Jurisdiction, § 513a, p. 447, n. 4. So the statement in Waggoner v. Waggoner, supra, that the rule of ignorance of the law excuses no one is not applicable "to the mistakes of persons as to their own private rights and interests" can be held to be applicable only as to the facts in that case, and cannot be held to state a universal rule. Smart v. Waterhouse, Tenn., 10 Yerg. 94, is based on fraud. Other cases cited by counsel for respondents are explainable by reason of their particular facts. We need not comment on all of them. In some instances courts do not seem to have been consistent throughout. Take for instance In re McCutcheon's Estate, 283 Pa. 157, 128 A. 843. We have not been able to reconcile some of the statements contained in that case with a later decision from that jurisdiction cited hereafter.

There are, however, left a number of cases which hold, or the excerpts from which state, that an election by a widow is not binding unless made with knowledge of her legal rights. See for instance Dick v. Taylor, 124 Kan. 646, 261 P. 579; Hanson v. Clark, 246 Ill. App. 496; In re Donovan's Estate, 409 Ill. 195, 98 N.E.2d 757, 29 A.L.R.2d 215; Tolley v. Poteet, 62 W.Va. 231, 57 S.E. 811; Merchants Nat. Bank v. Hubbard, 222 Ala. 518, 133 So. 723, 74 A.L.R. 646. These cases are irreconcilable with the cases cited by appellants that a widow is not allowed to change her mind after the expiration of the time fixed by statute. The reason for the difference is clear. The former class still adhere to the common law rule of election. For illustration of that see 28 C.J.S. 1098. The latter class of cases do not adhere to the rule holding that the statute is mandatory

and that equity follows the law. Thus we are compelled to make a choice.

The rule of the latter class of cases seems to have two sources. In the first place we have the general rule that mandatory statutes must be obeyed and that the courts have no right to make a law contrary to that prescribed by the legislature. In the second place the beginning at least of considering statutes mandatory in cases such as before us is clearly found in the fact that such statutes were enacted for the express purpose of remedying the evils of the law of election in such cases under the common law. That has been somewhat obscured in later years, although some reference to it is found in the case of In re Stitzer's Estate, 103 Colo. 529, 87 P.2d 745, 120 A.L.R. 1266. The earlier cases are clear on the subject. Stephens v. Gibbes, 14 Fla. 331, 357, 358, discusses the common law at some length. It points out that at common law no election was necessary except in certain cases; again that there was no limit of time in which an election by a widow was necessary to be made. The court states that anyone who knows anything about the history of election in such cases knows the mischief that existed at common law, and that the enactment of statutes by the legislature on the subject "originated in the desire and necessity for curing the evils incident to the common law rules upon these subjects." The case was brought to have dower assigned. It points out the statute providing that the widow was bound to take under the will unless she made an election to the contrary within the time specified. The court states among other things:

"Under this statute, it is impossible that the practice prevailing in a court of equity upon the subject of election can obtain. If the effect of the failure to dissent is in law an election to take the will, that is an end of the matter, because a court of equity except upon the ground of fraud, or some other like ground, cannot give a construction which will defeat the plain result of the

statute. And if the effect of the law is not such an election, it has no effect at all, as the whole matter is left just as it was before."

The reasoning of the case is flawless. From a logical standpoint at least it is impossible to disagree with it. And because the *law* makes an election in such case, other cases in which the widow makes an affirmative election one way or the other are probably distinguishable, since in the latter cases the *common law rule* could probably be more readily applied. No case, however, has discussed that feature. So we speak with some diffidence on this point. But it might well be said that if the *law* makes the election, what power has the court to permit a different one to be made?

Collins v. Carman, 5 Md. 503, 530, 531, 532, discusses a like statutory provision in the light of the common law. That case was an action in equity to elect against the will, after the expiration of the statutory time, on behalf of a widow who was insane, presenting if any fact could, an equitable reason for allowing the renunciation of the will. But the court would not allow it. The court states among other things:

"Every valid devise or bequest is, therefore, made an effectual bar, unless it be removed by a renunciation. And until that is made the bar remains. The law admits of no excuse for a failure to renounce. If she makes no election within the time prescribed, the law makes it, *without stopping to enquire why or for what reason she made none.* (Italics supplied.)  *  *  *"

"The law clearly gives to the husband the power by his will to bar, or extinguish the common law rights of his widow, unless she thinks proper to quit all claim to the property conferred upon her by the will. And to effect the husband's object the wife need not declare her assent; if however, she desires to defeat it, she must manifest her intention to do so, by an express dissent. And such dissent is an act, which by the very terms of the law, must precede her becoming entitled to or vested with, those rights which she might have claimed

but for the will; for the act declares, she shall be barred of those rights, if she does not renounce and quit claim to the devises and bequests, and make her election to take in lieu thereof her dower, or legal share of the estate. It is this election which vests in her the right of dower or legal share, in lieu of what the will had given (See 2 Devereux's Eq.Rep.,344). Whether from design, neglect, or from other cause, the widow fails to make such renunciation, the result is the same.  *   *   *"

"To acquire such rights in opposition to the will, the law makes the renunciation a necessary act. The non-performance of this act, is therefore, not a forfeiture of existing rights, but prevents the acquisition of those rights, which, by its performance, might be secured. *   *   *"

"When the law directs an act to be done, or a condition to be preformed for the purpose of conferring a right, that right cannot be acquired if the act is left undone, or the condition is not performed. And if no exception is made in favor of insane persons, courts of justice have no more power to decree to them the allowance of such rights, because of their mental incapacity to comply with the requisites of the law, than they have to decree in favor of sane persons failing to comply. If the law makes no exception the courts can make none, whether they be courts of law or equity; for where the construction of a statute is before them, the rules of construction are the same in both courts."

The case was cited with approval in Bish v. Bish, 181 Md. 621, 31 A.2d 348, 350.

In McDaniel v. Douglas, Tenn., 6 Humph 220, 230, the court also considered the common law rule of election. It held that in the absence of fraud the widow was bound by the provisions of the will. The court aptly stated:

"The case bears no analogy to some of the cases of election at common law; that is said to be a 'gentle nursing mother,' but the statute is stern and inflexible and exacts obedience. The statute has existed for more than sixty years; and there has been no case in North Carolina or Tennessee, which sanctions the principle of

construction in this instance contended for. To yield to the present application, would be a virtual repeal and abrogation of the statute. It is better that a few widows should be permitted to choose ignorantly and injudiciously, and to their loss, than that we should have no rule."

The common law rule of election was also considered in Craven v. Craven, 17 N.C. 338, 344, 345, 347, in which it appears that a statute similar to ours was passed. The court stated among other things:

"Where the language of a statute is free from ambiguity, there is much hazard of misconstruction by departing from it in search of the supposed policy of the Legislature. If however we are to suppose that the Legislature intended to establish a more general and precise rule of election, than that which theretofore prevailed, when a demand of dower by a widow conflicted with the will of her husband, this supposition will conduct us to the same result as is indicated by the literal construction of the statute.   *   *   *"

"The Legislature substituted a new rule, more absolute and universal.   *   *   *   And to remove all dispute as to the fact of her election, they declared her to have elected to take under the will, unless her refusal so to take was manifested within a prescribed time, by a solemn dissent in open court.   *   *   *"

"The law has defined the time, and prescribed the mode when and how, this fact can be certainly known. The most obvious considerations of public policy forbid, without the clearest warrant, judicial exposition which will have a tendency to defeat this great purpose of the law."

Thus the reason for the adoption of statutes such as ours on the subject before us is clear, and pulls strongly to have us arrive at the same result in this case. And that is even more true when we come to consider other authorities. 2 Pomeroy's Equity Jurisprudence, 5th Ed., the standard book on equity, is in accord with the rules laid down. The author in section 512, etc., discusses the comon law rules, similar to those asserted to be the rules by counsel for respondent. But the author

expressly states in § 511 that these rules govern in the absence of a statute on the subject, limiting the time in which an election must be made. In § 513a, the author states as follows:

"These purely equitable rules, at least so far as they affect widows electing between testamentary benefits and dower, have been greatly modified by legislation in this country. In very many of the states statutes have been passed which prescribe definite periods of time within which the right of election between dower and a provision made by will must be exercised. Courts generally have held that legislative acts of this character are simply statutes of limitation fixing a definite time after which an election, if filed, cannot be considered. If dissent is not indicated within the prescribed time and in the manner required by law, the widow is conclusively presumed to have elected to take under the will, no matter how hard the decision in a particular case may seem to be. This is so except in cases of fraud, and perhaps under some other exceptional circumstances."

And in § 519c, the author, though also citing cases to the contrary, states:

"Ordinarily, in the absence of a showing of fraud, and where no laches appears, a widow's petition to revoke an election between the provisions of her husband's will and her statutory rights must be presented within the period within which she is required to signify her election."

Following the line of reasoning of the foregoing authorities, the Colorado Supreme Court in In re Sheely's Estate, 102 Colo. 194, 78 P.2d 378, 379, held that failure to renounce the will within the time fixed by statute, namely six months, is conclusive of her duty to take under the will and the statute is mandatory. Counsel for respondents think that the case is not in point because that statute provided "The failure to make and file such election within said period of six months shall be conclusive evidence of the consent of the surviving wife or husband to the provisions of such

will." We think our statute means exactly the same as the Colorado statute. This appears more clearly when we consider other cases. In Indiana the statute provides that the widow takes under the will "unless she shall make her election to retain her rights in the husband's estate given to her under the laws of the state of Indiana, which election shall be made in the manner hereinafter provided." It may be noted that this statute is not nearly as explicit as our own, yet the construction put upon it is the same as on the Colorado statute. In Haas v. Haas, 121 Ind.App. 335, 96 N.E.2d 116, 119, the court said:

"These statutes have been construed to mean that in all cases where there is a will, the widow is conclusively bound by it unless she renounces its provisions and elects to take under the law in the manner pointed out in the statute. Fosher v. Gilliams, Executor, 1889, 120 Ind. 172, 22 N.E. 118, Collins v. Collins, 1891, 126 Ind. 559, 25 N.E. 704, 28 N.E. 190.) To put it another way, on the death of a husband who made testamentary provisions for his wife, the failure of the surviving widow to make her election to take under the law instead of the will within six months after the probate thereof raises a conclusive presumption that she has accepted the provisions made for her in the will. Easterday, v. Easterday, 1938, 105 Ind.App. 80, 10 N.E.2d 764."

In Tennessee the statute provides:

"A widow may dissent from her husband's will:

"(1) Where a satisfactory provision in real or personal estate is not made for her; in which case, she shall signify her dissent in open court, within one year after the probate of the will."

It may be noted that this statute, too, is not as explicit as ours, but the same construction is put upon it as upon the Colorado statute. In McGinness v. Chambers, 156 Tenn. 404, 1 S.W.,2d 1015, 82 A.L.R. 1492, 1493, 1494, the court stated among other things, after referring to the statute, and quoting from another case:

" 'In looking at the language of the Code, it will be seen that it involves the idea necessarily that the widow is prima facie bound by the will of her husband, but that a privilege is conferred on her by which she may avoid its provisions as to herself, and she may dissent from it. She is not required to assent to the will, but the will is binding and conclusive on her as to its dispositions, unless she shall signify her dissent in open court within one year after the probate of the will. In other words, the will is a perfected act, vesting rights and fixing title as to the widow, which may be defeated and rendered nugatory, so far as she is concerned, by dissent, signified in open court within the twelve months after probate of the will. These principles have been repeatedly held by this court, and such is the plain meaning of the statute. It is even held, and conclusively settled as the law, that if the widow fails to dissent within the time allowed by law, it will be presumed conclusively that the provisions are satisfactory to her, and she having thus, by failure to dissent from the will, elected to take under it, can not be allowed to share in the estate of which her husband died intestate, and can only receive the property given to her by the will.' Waterbury v. Netherland, 53 Tenn. (6 Heisk.) 512."

And in the late case of Pinkerton v. Truman, 196 Tenn. 448, 268 S.W.2d 347, 350, the same court, after citing the statute, stated as follows:

"It is settled law in this state that 'if the widow fails to dissent within the time allowed by law, it will be presumed conclusively that the provisions are satisfactory to her, and she having thus, by failure to dissent from the will, elected to take under it, can not be allowed to share in the estate of which her husband died intestate, and can only receive the property given to her by the will.' Wrenne v. American Nat. Bank, 183 Tenn. 247, 256, 191 S.W.2d 547, 551, opinion by Mr. Justice Gailor. The opinion goes on to say, 'This has been the law in Tennessee from very early times, as is evident from many reported cases', citing cases. The first reported case is that of Malone v. Majors, 27 Tenn. 577, decided in 1847, opinion by Mr. Justice Turley."

In other cases, the courts have held that a statute like ours fixing the time in which a surviving spouse

must dissent from the will has been held to be a statute of limitation, and it is said that a court of equity may not give relief from such a statute no matter what hardship may be created, unless, perhaps, it be by reason of fraud or the like. In re Zweig's Will, 145 Misc. 839, 261 N.Y.S. 400. Thus the Colorado Supreme Court which, as noted, held the failure to elect to be conclusive on the rights of the widow, in the later case of In re Stitzer's Estate, 103 Colo. 529, 87 P.2d 745, 120 A.L.R. 1266, designates the statute as a statute of limitation. Other cases to the same effect are Schweer v. Schweer, Mo.App., 86 S.W.2d 969; Ludington v. Patton, 111 Wis. 208, 86 N.W. 571; In re Zweig's Will, 145 Misc. 839, 261 N.Y.S. 400; Akin v. Kellogg, 119 N.Y. 441, 23 N.E. 1046. Thus it is said in Palmer v. Voorhis, N.Y., 35 Barb. 479, 483:

"The devisees and grantees of the husband are under no obligation to give the widow notice of the provisions made for her by the will, and to require her to make her election. This is not the purport of the statute. It imposes no such duty on them as a condition of exonerating their lands from the burden of her claim. She is presumed to know, as well as any one else, when the death of her husband occurs, and although she may not become apprised of the contents and provisions of his will within the period of a year after his death, she is bound to know that if she omits for that space of time to enter upon the lands, or commence proceedings for the recovery or assignment of her dower, her claim will be barred if there is a will with a pecuniary or other provision made for her in lieu thereof. In this respect the statute operates as a limitation of her right of action; so that if the conditions upon which it applies actually exists, unless she commences her action within the time limited, the right to recover is barred as effectually as it would be, in the absence of a testamentary provision, by the omission to commence her action within the twenty years mentioned in the 18th section of the act."

Numerous cases announce the rule that under a statute similar to ours, the surviving spouse *must* dissent

from the provisions of the will within the time fixed by statute, excepting cases involving fraud or the like. Thus it is said in First Nat. Exchange Bank of Roanoke v. Hughson, 194 Va. 736, 74 S.E.2d 797, 804:

"This paramount right to share in the estate under and as allowed by statute must be exercised within a year of the time of admission of the will to probate to become effective. That limitation, however, merely restricts the time in which the right may be availed of and does not lessen its certainty, Yet within the year the widow or widower must elect to take by the will or against it, and election to take under the statute forfeits all rights enjoyed and provisions made for him or her in the will. Mitchell v. Johnson, 1835, 6 Leigh 461; Kinnaird, Ex'r. v. Williams' Adm'r. 8 Leigh 400; Findley's Ex'r. v. Findley, 11 Grat. 434, 52 Vr. 434; and Nelson's Adm'r. v. Kownslar's Ex'r., 79 Va. 468."

In Stearns v. Stearns, 103 Conn. 213, 130 A. 112, 116, the court stated:

"The statute is too plain to require construction. The will did give to the husband a portion of the estate of testatrix. The husband made no election in writing as to whether he would accept or reject the provisions of the will in lieu of his statutory share as husband of the testatrix. The terms of this statute are explicit, and however unfortunate the result, the facts of record bring the case exactly within the statute and require us to hold that the husband 'shall be taken to have accepted the provisions of the will, and shall be barred of said statutory share.' "

In re Daub's Estate, 305 Pa. 446, 157 A. 908, 911, 81 A.L.R. 735, the court stated:

"No matter how hard the decision in a particular case may seem to be, if a widow does not make her election within the statutory period, the courts, because of that act, must declare that she is deemed to have made an election to take under the will, for this 'statute here fixes the time as definitely as does that relating to taking appeals, and both are mandatory. * * * In view of the positive provisions of the statute we are not persuaded that relief could be granted ex gratia.' In re

Minnich's Estate or Sherwood's Estate, 288 Pa. 354, 358, 136 A. 236, 237. * * *"

"A different conclusion will, of course, be reached in cases where actual fraud has been committed to obtain the widow's election, and no laches appears, for fraud vitiates everything it touches."

And the court further held that a misrepresentation of one executor without intent to defraud is no ground for permitting a widow her election to take under the will. Similar in effect, aside from the cases already cited, are: Hamilton Nat. Bank v. Haynes, 180 Tenn. 247, 174 S.W.2d 39; Bunker v. Murray, 182 Mass. 335, 65 N.E. 420; Morgan v. Christian, 142 Ky. 14, 133 S.W. 982; Landers v. Landers, 151 Ky. 206, 151 S.W. 386; McGlaughlin v. McGlaughlin's Legatees, 43 W.Va. 226; 27 S.E. 378; In re Broad's Estate, 325 Pa. 541, 190 A. 872; In re Zweig's Will, 145 Misc. 839, 261 N.Y.S. 400; In re Goldstein's Estate, 176 Misc. 366, 27 N.Y.S.2d 288; In re Paskievitz' Estate, 184 Misc. 320, 55 N.Y.S. 2d 595; In re Brown's Estate, 69 N.Y.S.2d 864.

In 173 A.L.R. 999, we find an annotation dealing with extension of time in which to accept or renounce the provisions of a will. Numerous cases are cited. The fundamental principle involved in all, or most of these cases is the same as the principle involved in the case at bar, and substantially all the cases cited and quoted hold that when the surviving spouse fails to elect within the time fixed by statute, she must take under the provisions in the will of a testator.

Notwithstanding this great array of authorities, in which the courts have considered the statutory provisions to be mandatory, counsel for respondents contend that we should follow the common law rule of election, in which time is not considered to be of the essence, and that equity will give relief. We have already seen that Stephens v. Gibbes, 14 Fla. 331, and Collins v. Carman, 5 Md. 503, followed by another Maryland case,

hold the contrary. Perhaps the leading case on the subject before us, because of the comprehensive discussion of all the phases on this subject, is In re Zweig's Will, 145 Misc. 839, 261 N.Y.S. 400. Counsel for respondents say that the case is distinguishable because the probate court of New York has no equitable jurisdiction. But it has jurisdiction, by statute, to extend the time within a limited period, which itself seems to be equitable in its nature. Further the court expressly considers the subject of whether or not a court of equity. can give relief after the expiration of the time fixed by statute, and states that courts of equity are powerless to vary the direct mandate of legislative enactments as are courts of law, and that this has been determined on innumerable occasions. The court cites many cases. In re Freer's Estate, 353 Pa. 351, 45 A.2d 47, 49, the court states:

"Since the will of the decedent was probated in Franklin County and no appeal from this probate was taken it follows that if the surviving husband wished to elect to take against his wife's will, it was incumbent upon him to manifest this election by a writing signed by him and duly acknowledged and delivered to the executors of the estate within one year after letters testamentary were issued. His failure to do so is legally deemed an election to take under the will. Courts have no power to extend the one year statutory limitation. In re Broad's Estate, 325 Pa. 541, 190 A. 872."

In Moise v. Moise's Ex'r, 302 Ky. 843, 196 S.W.2d 607, 608, the syllabus is as follows:

"A chancery court has no power to grant testator's widow additional time to determine whether to renounce will after expiration of statutory period for renunciation thereof, unless application for extension of time is made within time prescribed by statute for such election."

And in that case the court also stated:

"But no case has been called to our attention where, the twelve month period having expired, the Court approved the allowance of additional time to determine

344

whether or not to renounce. On the other hand, the reasoning contained in the opinion of McGinnins v. McGinnis' Ex'r, et al., 300 Ky. 759, 190 S.W.2d 323, which we feel constrained to follow, forces us to the conclusion that the Court is without authority to grant additional time for renunciation, unless requested to do so before the expiration of the time prescribed by Statute * * *. A widow's failure to renounce the will within the statutory period of time is tantamount to a formal declaration that she has elected to take under the will, and is as solemn and binding upon her as a renunciation would have been, if made. It seems to us that, if the Court is without power to permit the withdrawal of a renunciation after the period for renouncing has expired, it likewise is without power to grant additional time to determine whether or not to renounce, unless application be made therefor within the time prescribed by Statute for the election.

"In other cases wherein Statutes limit the time in which acts may be done, we have held that the Court may not extend such time, unless application therefor shall have been made before expiration of the time allowed by Statutes."

In Shelton v. Sears, 187 Mass. 455, 73 N.E. 666, 668, the court stated in part as follows:

"It is suggested that she may have relief in equity against the operation of the statute, on the ground of accident or mistake in not earlier asserting her claim, and that she should be allowed by amendment to change her writ of dower into a bill in equity. But the form of procedure cannot change the result. Not only is no fraud or concealment shown, but she knew of the contents of the will and of its admission to probate, and at the time was acting under legal advice. Motherway v. Wall, 168 Mass. 333, 338, 47 N.E. 135. The only excuse offered for her inaction is that she was ignorant of the law, but this is not sufficient in equity, any more than at law, to overcome the express limitation fixed by statute within which she must act or be forever barred. Upham v. Wyman, 7 Allen, 499, 502; Currier v. Studley, 159 Mass. 17, 33 N.E. 709."

In Allen v. Hartnett, 116 Mo. 278, 22 S.W. 717, 719, the court under a statute similar to ours stated in part:

"This right is purely statutory. It did not exist at common law. Then, to entitle the widow to its benefits, she must bring herself within its provisions. Equity can afford her no relief. Admitting all the evidence introduced in her behalf to be true, then she did not comply with the statute. That she intended to do so there can be no question. It devolved upon her to see that her election was not only duly and timely executed, but that it was also filed in the office of the judge of the probate court of St. Charles county within 12 months after the granting of letters of administration on her deceased husband's estate. * * * Such instruments are not filed, however, until deposited in the proper office, and the far-reaching arm of a court of equity, however willing it may be to do so, is not long enough to furnish relief in case of the defective execution of a statutory power, or dispense with any of the formalities required thereby for its execution. Houx v. County of Bates, 61 Mo. 391; Moreau v. Detchemendy 18 Mo. 522. When the statute specifically prescribes the manner in which a certain thing shall be done, it is strictly construed. Hyde v. Goldsby, 25 Mo.App. 29, and authorities cited."

The case was expressly approved, quoting part of what is quoted above, in Wash v. Wash, 189 Mo. 352, 87 S.W. 993. In Akin v. Kellogg, 119 N.Y. 441, 23 N.E. 1046, 1047, 1048, the court stated:

"I think, even if we assume the truth of these charges of her complaint, that her right to relief in equity is most doubtful. She does not ask for relief against some positive act of her commission, procured by the fraud of another. She asks for it because, through reliance upon the statements of others, she remained inactive, and thus suffered the period of time to expire within which she should have been diligent to ascertain and to secure her rights. Now, equity does not interfere to grant relief when one has failed in diligence, or in the performance of an obvious and imperative duty imposed by law. It does not rise above the common law and the statute. Its office is not to relieve against a hardship, merely as such; nor should its interference be moved by mere opinion in the judge. I do not think the equitable powers of a court can be properly invoked to interfere with the established rules of law. * * *

This being, then, a statute of limitation upon the widow's right to enforce her claim to dower, the policy of the law in such a case, as in all cases involving the operation of such a statute upon a person's rights or demands, forbids the granting of relief against its provisions. The statute has acted, and the right has gone. Nor is this the ordinary case of election, where knowledge is necessary in order to make it validly; and hence, where there was a mistake of facts, or a misconception as to rights, relief in equity is allowable. Here the statute does not offer or create the election. That existed already. The office of the statute was to impose a limitation of time upon the exercise of the power to elect, and to bar any subsequent exercise of it. * * * She was bound to know that the law compelled her to make her election as to whether she would abide by the will or not within a year. Ignorance of that law is no excuse."

In Ludington v. Patton, 111 Wis. 208, 86 N.W. 571, 578, the court stated among other things:

"No further discussion of this subject seems necessary. The decisions cited to our atttention in the briefs of counsel for appellant, to sustain the theory that a court of equity has power to relieve a widow from the effect of an election or failure to elect to take the provision made for her by law instead of the one made for her by her husband's will, because of mere ignorance or mistake on her part, cannot be followed. They are out of harmony with the doctrine of this and most courts."

We think we are constrained to hold that our statute hereinbefore quoted is mandatory, and that Mrs. Hartt had no right to dissent from the will after the expiration of six months mentioned in the statute. However, in order to show that the result of applying the statute is not nearly as drastic at least as applied to this case as counsel for respondents would have us believe, we shall, as briefly as possible, examine some of the facts that appear in the record and some of the law applicable in that connection. And we must remember that equity is not always at odds with the law. We have no doubt that when the legislature enacted § 6-301 W.C.S. 1945, it

thought that it was treading in the path of equity. We cannot say that is not true. Courts have no exclusive claim to that path.

The evidence in the case at bar shows that Mrs. Hartt, the widow, was present when the will of the testator was executed, so that she must have had at least a general idea what the will contained. The will was read with the widow present, after the death of testator. At that time Mr. Bible read to the widow and most of the daughters from a statement containing substantially an inventory of the estate. He valued the estate at slightly more than the sum at which it was subsequently valued in the inventory filed in the case. The will was admitted to probate. No objections on the part of the widow were heard until the summer of 1953, when Bible bought some stock in the sheep companies from Mrs. Hartt's brother and part of which was distributed to Marjorie Higley, one of the daughters, and to her husband. Mrs. Hartt did not like Marjorie's husband. She testified that she was angry when she found that Mr. and Mrs. Higley got hold of some of the stock. Thereafter she consulted Mr. Senior of Salt Lake City. Soon thereafter we find such a barrage of lawsuits in connection with this estate as finds few parallels in the law books. Two of these have already been decided by this court. See Hartt v. Brimmer, 74 Wyo. 338, 287 P.2d 638 and 74 Wyo. 356, 287 P.2d 645.

Mrs. Hartt testified that she did not know that she had the right to dissent from the will. As already stated, she was present at the time the will was executed. For more than two years from that time she had the opportunity to investigate her rights. She alleges that she relied on Bible and Brimmer. She talked with the former nearly every week after July 1952 until she left Rawlins. She did not manifest any sign that she was in the executors should have advised her of her rights. It any way dissatisfied with the will. She contends that

is stated in 90 C.J.S. 225 that: "By accepting the trust, a trustee (executors are trustees) becomes bound to administer it, or to execute it, in accordance with the provisions of the trust instrument and the intent of the settlor." In determining his duty, the intention of the testator is of controlling importance. Robinson v. Elston Bank & Trust Co., 113 Ind.App. 633, 48 N.E.2d 181, 49 N.E.2d 348. Hence the first and primary duty of the executors in this case was to see that the intent of the testator was carried out. It was not their duty, in fact it would have been a violation of their duty, to do anything that would nullify the provisions of the will. True the executors had no right to defraud the widow or by chicanery induce her not to dissent from the will. But no fraud or chicanery is shown herein. The court in Stephens v. Gibbes, 14 Fla. 331, 356, stated:

"Neither the executors, the other devisees or legatees, nor the creditors, are in any legal sense under an obligation to give the widow notice of the provisions of the will. The law presumes her knowledge of the will and its contents as well as her knowledge of her right of dower and its nature, and she is bound to know that if she omits for the space of one year to signify her dissent, she cannot claim dower."

That, of course, applies as well to her right to take under the statute of descent and distribution. In Ludington v. Patton, 111 Wis. 208, 86 N.W. 571, 579, the court laying down the same rule stated:

"The contention of respondents' counsel that the executors of the estate of Gov. Ludington had a legal and equitable right, if they saw fit, to remain passive for the year subsequent to the admission of the will to probate, conscious that by so doing the appellant, through her ignorance, would lose her widow"s rights under the law, and that they and the Ludington children would be greatly enriched by such loss, must be sustained.

"The foregoing conclusion goes as far in sustaining the contention of counsel for respondents, that the trial court erred in deciding that Patton and Van Schaick breached their duty to appellant in failing to inform

her or put her in the way of informing herself as to what was the best course to pursue as regards her husband's estate, and in dealing with her to her disadvantage, as any of the authorities upon which they rely."

See also Akin v. Kellogg, 119 N.Y. 441, 23 N.E. 1046, from which we have heretofore quoted; 2 Bancroft's Probate Practice, 2d Ed., § 278; Zottarelli v. Pacific States Savings & Loan Co., 94 Cal.App.2d 480, 211 P.2d 23; Reiner v. Fidelity Union Trust Co., 126 N.J.Eq. 78, 8 A.2d 175; Annotation, 39 A.L.R. 329.

Under the provisions of § 6-301 W.C.S. 1945, a widow to whom less than half of the estate of a testator has been left has the right to choose to take one-half of the estate, provided that she so chooses within six months after the probate of the will, and presumably takes the one-half by absolute title. Mrs. Hartt did not file her dissent from the will within the time fixed by statute, but waited for over 14 months in which to petition the court for permission to file her dissent. In such a situation a principle of equity enters the case, assuming that she had any right to dissent from the will at that time. The basic thought underlying the cases which hold that a widow may change her mind after the expiration of the time fixed by statute is that the widow had been treated unfairly, and that an injustice should be remedied. In other words she seeks equity. Now counsel for the respondents go upon the theory that the widow has not been treated equitably and fairly unless she receives the one-half of the property by absolute title. But is that assumption justified? We are now in a court of equity. We have found no case in which this question has been discussed. Neither have we found any cases in which a will disposes of substantially a million dollars in the manner in which it was done in the case at bar. So we have an entirely new question before us, and we must dispose of it as

a court of equity should, again assuming that the widow has any right at all at this time to change her mind. The widow in this case was left the entire income of the property left in trust, together with the right to consume all of the corpus, if necessary. And the question before us is: Is that an unfair and unjust will, so far as the widow is concerned? Even at first glance, let alone after long deliberation which we have given the point, we think the unqualified answer must be in the negative, unless it be in connection with Federal taxes against the estate, which we shall mention later. We presume that when equity intervenes to permit a widow to dissent from a will after the expiration of the statutory time, the fundamental purpose is not so much to give her a certain additional number of dollars or a certain amount of property, but to give her an additional amount of protection so that she may live in greater ease and in greater comfort in her old age. We know of no more effective way to protect a widow of rather advanced age and of rather limited business experience, as is true in the case of Mrs. Hartt, than to give her the whole of the income of a comparatively large estate, plus the corpus, if necessary. It is difficult to perceive why a court of equity should interfere with the provisions of a will of that kind. Trusts are well known. Provisions for a widow through a trust are frequent and it is in fact a common method in connection with large estates. The testator knew his wife, her strength and her weakness, whether or not she would be unduly influenced by one or more of her daughters and thus perhaps fritter away her property and possibly ultimately leave her penniless. It is rather hazardous for a court to substitute its judgment as of greater wisdom than that of the testator who had known his wife for fifty years. There is testimony in the record that she could, if she received one-half of the property, give each of her six daugh-

ters the sum of three thousand dollars each year. That but accentuates what we have said. The welfare of the daughters is wholly irrevelant on the question before us. The testator, if of sound mind and not under undue influence, had the right or privilege to do with his property as he wished so far as the daughters are concerned. And no question of testamentary incapacity enters into this case. Five of these daughters are dissatisfied because the principal of the estate, left after the death of the widow, goes to them only after the expiration of 8 years after the widow's death. All of the daughters are mature women, the youngest being above thirty years of age, so in view of that fact the provision is rather unusual. But the court has no power to eliminate it, unless, perchance by and with the consent of all interested parties. We might add as an explanation of this provision that the testator perhaps wanted to provide for his daughters after middle or old age when their or their husband's earning capacity had decreased. If so, the provision was perhaps wise, rather than unwise.

W. P. Farthing, an attorney, who has given special attention to Federal taxation, testified that if the widow would elect to take against the will, there would be an immediate saving of Federa lestate taxes of about $135,000; that if she died immediately, her estate would then be required to pay about $102,000, making a saving of only about $33,000; that if she lived out her expectancy of life, made no gifts, and saved about $5,000 per annum, her estate would then pay from about $119,000 to about $151,000. This witness did not know whether the Bureau of Internal Revenue would recognize an election made after the statutory time had elapsed, thus leaving the question whether there would be any tax saving altogether problematical.

We can readily understand the anxiety of the trial court in this connection, feeling as all of us do the onerous burden of Federal taxation, hoping that the $135,000 might in the first instance be saved the estate, and doubtless figuring that a bird in hand is worth two in the bush. It is not improbable that this fact, more than anything else caused it to enter the judgment permitting the widow to dissent from the will, as well as removing the executors, feeling that they were responsible for not saving this sum at this time. It might be suggested that this amount of $135,000 might well have been taken by the widow and advantageously invested in an annuity. There is, however, a flaw in that suggestion. If she dissented from the will she could not take that sum from the estate, but would have to take it out of her one-half. She could not have taken it out of the share of the children. We, too, should be glad to have the foregoing sum saved, if it could be done consistent with the wishes of the testator. The contention that the executors should have informed the widow of the effect of the Federal estate taxes is not well taken, as we have already seen. They did not have the duty to advise her to do any act which would nullify the will. And the contentions of the respondents, if sustained, would result in that. The trouble in this whole matter is that the respondents try to shift the burden of not saving the foregoing sum at the present time on the wrong shoulders—on those of the executors. The testator is no longer here to defend himself, so respondents try to find a scapegoat. The responsibility in this connection rests solely and exclusively on the shoulders of the testator, and on those of no one else. Appellants offered to prove that the testator consulted an expert on taxation before or at the time when he executed his will. The court refused to permit that testimony. That is not important. Testator was as tax-conscious as every business man is. He is presumed

to have known the law. In fact we may well assume, without violating any legal rule, that he, with his business acumen, fully informed himself of the amount necessary to pay Federal taxes and deliberately made his will in the face of that fact. He had a legal right to do so. Should or can a court of equity say that he did not have that right? Moreover, we may well revert to the question asked before: Can a court of equity, under the facts confronting us, say that the widow was treated unfairly and unjustly, and substitute its judgment for that of the testator? We think we should give the same answer which we gave before. Who, in this uncertain world, is so wise as to be able to look into the future and say that the provisions made by the testator were unwise?

We do not pretend to be seers, but, if this state keeps on being developed as it has in the past, it is not unlikely that we may have in the future numerous men with considerable wealth who may want to provide for their widows in a like or similar manner as the testator did in this case despite the laws on taxation, and for the reason, as already indicated, such method i sone of the most effective methods for the protection an dwelfare of a widow of advanced years and of limited business experience, when the amount involved is not small. It hardly behooves our courts to deter them from so doing by not guarding such wills against untimely dissent, or cause them to go to other states with more liberal rights of testation.

Counsel for respondents want us to consider the statement of K. N. Llewellyn in 46 Columbia Law Review, p. 167, to the effect that a decision should make sense in simple terms of life and justice. The trouble in this case is that respondents and their counsel look at equity and justice from too narrow a standpoint. Not a single voice is raised in testator's behalf by any

member of his family except that of his daughter Marjorie Higley. The others consider this case from their own standpoint alone, ignoring the wishes of the testator. We recall but one sentence in the voluminous briefs of their counsel which makes any reference to the testator's wishes. Practically speaking, they take the position—which they would disavow—that the wishes of the testator must be disregarded if they conflict with the wishes of those upon whom he bestowed his bounty. We do not, of course, blame them. Everything in their view must be determined in favor of the living; the testator is in his grave; his wishes are no longer of importance. We, along with at least many of the courts, think that is too narrow a view; that the testator's wishes must be carried out, if within the bounds of law, as they are in the case at bar. After all, it is his property with which we are dealing. He accumulated it; he could have given it away in his lifetime and left his widow practically penniless; he could have disposed of it in his will as he desired, if not contrary to law, as it is not in this case. It is, and for many centuries has been, a common thought in our economic system, that to execute a last will and testament is the most solemn and sacred act of a man's life. It is not our province to make light of that. It would not be becoming of us to give men and women to understand that as soon as they are lowered in the grave, those upon whom they have bestowed their bounty may engage in a scramble over the property at will. To say that would, we think, be poor public policy, contrary to the interests of society and should not be encouraged.

II. Removal Of The Executors.

Pearl Hartt, widow of John K. Hartt, deceased, together with five out of six of her daughters who were also daughters of the deceased, filed their petition in the matter of the probate of the estate of the deceased,

asking in substance that Robert Bible and Clarence A. Brimmer, appointed as executors under the will of deceased, be removed, and that they should not be appointed as trustees under the will although named herein as such, for the following reasons: (1) The personal interest of the executors conflict with and are adverse to their official duties as such executors and trustees. (2) There are hostile feelings between the executors and petitioners which will or are likely to interfere with the orderly and proper management of the estate and trust. (3) The executors have neglected to comply with mandatory duties imposed on them by statute. Reference to the particulars of these objections, or at least those worthy to be mentioned, will be made in the discussion which follows:

The court granted the prayer of the petitioners, removed the executors as being incompetent to administer the estate and directed them to turn the property of the estate over to a special administrator. The executors and Marjorie Higley, one of the daughters of testator, have appealed to this court. The plaintiffs will be referred to as respondents. The term appellants includes the executors and Marjorie Higley.

Before proceeding further we should, we think, refer to some general principles which have been enunciated by the courts in this connection. It is stated that an order of removal is harsh and severe; that it is serious, that it is drastic. In re Bell's Estate, 135 Cal. 194, 67 P. 123; Pyle v. Pyle, 137 App.Div. 568, 122 N.Y.S. 256. In re Bailey's Estate, 306 Pa. 334, 159 A. 549, 551, the court stated:

"It is a serious matter to dismiss trustees appointed by will; much more should be shown by those who wish them dismissed than would be the case where the trustees are appointed by the court. Perry on Trusts (6th Ed.) 276, says: 'The power of removal of trustees appointed by a deed or will ought to be exercised spar-

ingly by the courts. There must be a clear necessity for interference to save the trust property. Mere error or even breach of trust may not be sufficient; there must be such misconduct as to show want of capacity or of fidelity putting the trust in jeopardy.' "

Irregularities not directly harmful in managing the estate will be overlooked. In re Gerbereux' Will, 148 Misc. 461, 266 N.Y.S. 134. If the court can readily remedy a matter of complaint, no removal will be ordered. Massey v. Stout, 4 Del.Ch. 274; 2 Bancroft's Probate Practice, 2d Ed., 184; Wilson v .Smoot, 186 Ky. 194, 216 S.W. 129. In 90 C.J.S. 193, 194, relating to trusts, it is stated: "In order to warrant removal, there must be such gross negligence or misconduct as to evidence a want either of capacity or fidelity, putting the trust in jeopardy." The misconduct must be willful. Massey v. Stout, supra. See also 33 C.J.S. 1037. In Smith v. Heyward, 115 S.C. 145, 105 S.E. 275, 282, the court stated:

"The courts have ever been reluctant to take the management of an estate from those to whom it has been confided by the testator, for to that extent the intention expressed in his will would be defeated. No doubt, the courts have the power to do it in a proper case. But for obvious reasons it is a power which should be exercised with great caution, and not at all, unless it is made to appear to be necessary for the protection of the estate, to prevent loss or injury to it from misappropriation, maladministration or fraud.

"In Stairley v. Rabe, McM. Eq. 22, the court said:

" 'The rule certainly is that the administration will not be taken from an executor without strong reasons, "because," says Lord Erskin in Middleton v. Dodswell, 18 Ves. 268, "it is for the testator, not the court, to say in whom the trust for administration of his effects shall be reposed." ' "

In Shelton v. McHaney, 343 Mo. 119, 119 S.W.2d 951, 954, 960, the court stated in part:

"A trustee will not 'be removed for every violation of duty, or even breach of trust, if the fund is in no

danger of being lost. * * * There must be a clear necessity for interference to save the trust property. Mere error, or even breach of trust, may not be sufficient; there must be such misconduct as to show a want of capacity or of fidelity, putting the trust in jeopardy.' 1 Perry on Trusts, 7th Ed., § 276, notes 93, 94. * * * Defendants are testamentary trustees, named by the testator. 'The court will less readily remove a trustee named by the settlor than a trustee appointed by the court or by a third person who is by the terms of the trust authorized to appoint a trustee. The court will not ordinarily remove a trustee named by the settlor upon a ground existing at the time of his appointment and known to the settlor and in spite of which the settlor appointed him, although the court would not have appointed him trustee.' 1 Restatement of the Law of Trusts, p. 280, § 107 (a) ,f.

&ast; &ast; &ast; &ast;

"We are dealing with trustees appointed by the creator of the trust after personally securing their consent to serve. The trust estate was created after mature deliberation and the trustees are men which whom the trustor had been associated in business and in whose business ability he had confidence. The cestuis take under testator's will. They may not escape the conditions there imposed or avoid testator's preference of trustees to administer his estate without just and sufficient cause. Testator's desires, as well as the desires of the cestuis, are to be considered."

In petition of Commonwealth-Atlantic Nat. Bank, 249 Mass. 440, 144 N.E. 443, 447, the court stated in part:

"Nomination of a person to act as his executor by one making his will imports signal trust and confidence in the particular person so named. Such nominations with respect to natural persons as matter of common knowledge are inserted in a will because the one executing the will reposes special reliance upon the individual integrity, sagacity, capacity, good faith, friendliness and sympathy with testamentary wishes on the part of the specified person."

In re Chadbourne's Estate, 15 Cal.App. 363, 114 P. 1012, 1013, the court stated:

"In the first place, it should be and is the policy of the law to give effect, as far as it can be legally done, to the expressed will of the deceased. The nomination of the executor is evidence of the confidence reposed in him by the testator, and the deliberate purpose and desire thus solemnly expressed as to the administration should not be thwarted, unless the plain provisions of the law or the interests of justice demand it."

In Wilson v. Smoot, 186 Ky. 194, 216 S.W. 129, the rule here involved is stated distinctly in a syllabus of the Kentucky Reports as follows:

"Trusts—Trustee Under Will—Removal.—A trustee appointed under a will will not be removed from his trust except upon the clearest testimony showing his incompetence or incapacity to act as trustee, or his intentional or grossly negligent management of the trust property, and where the only derelictions with which he is charged or attempted to be proven is that he failed to make settlement in the manner and at the times required by law, and failed to manage the property so as to realize the greatest possible profit, he will not be removed, especially when his appointment was made in the will of his wife who directed that he manage and control the property according to his judgment, and in which she expressed utmost confidence." A good discussion of the general principles involved is found in Massey v. Stout, 4 Del.Ch. 274, 275. We quote some of the syllabi:

"The power of the Court to remove trustees appointed by deed or will, is exercised very sparingly, the principle being maintained that there must be clear necessity for its interference, in order to secure the trust fund against loss or misapplication.

"The Court will not remove a trustee appointed by deed or will, for error or misjudgment in some special transactions, or even for a breach of trust. There must be such gross negligence or misconduct as to evidence a want either of capacity or fidelity, putting the trust in jeopardy.

"Where the trust is not put in jeopardy, the remedy against a trustee for a breach of trust is to charge him

for the consequences of his acts; or he may be enjoined from any improper act meditated, but not executed."

Throughout their brief counsel for respondents rely to a great extent upon the rule that we have no authority to reverse the judgment of the court below unless we find there was a clear abuse of discretion. There are a great many authorities differing in their view as to what abuse of discretion means. It is stated in Swall v. Anderson, Cal.App., 140 P.2d 196, syllabus 7, that: "An 'abuse of judicial discretion' means merely that reviewing court would have decided differently under the same circumstances." To the same effect is Borger v. M i n e r a l Wells Clay Products Co., Tex.Civ.App., 80 S.W.2d 333, 334. In Puterman v. Puterman, 69 Wyo. 89, 205 P.2d 815, 822, we stated:

"Many courts in defining the words 'abuse of discretion' as opposed to the words 'sound discretion' have used substantially the language employed in the case of Detroit Fidelity & Surety Co. v. Foster, 170 S.C. 121, 169 S.E. 871, 881, as follows: 'The term "abuse of discretion" does not mean any reflection upon the presiding judge, and does not carry with it an implication of conduct deserving censure, but is strictly a legal term indicating that the appellate court is of the opinion that under the circumstances the trial judge committed error of law in the exercise of his discretion.'"

To the same effect is Brown v. Beck, 64 Ariz. 299, 169 P.2d 855. True the term has been, even by this court, used in a different sense. And it is said in many cases that the trial court has a wide discretion, and will not be reversed even though reasonable minds may differ regarding the facts. However the discretion of removing executors and trustees has been circumscribed by rules. We cannot shirk our duty to examine the facts, and if, in the light of the circumscribing rules, we are clearly of the opinion that the facts do not warrant the removal, we should, in a case like the one at bar, say

so, and not take the easy way out by saying that the removal was in the discretion of the court.

A. Violation of Statutes.

It is claimed by the respondents that the executors should be removed because they did not comply with certain provisions of the statutes. We cannot, of course, encourage violation of specific provisions of the statutes, but whether or not failure of strict compliance therewith is sufficient ground for removing the executors is another matter. The statute, § 6-1301 W.C.S. 1945, provides that an inventory shall be filed within a reasonable time after the appointment of the executor or administrator. In this case the executors filed an inventory on April 17, 1953, about eight months after the will was admitted to probate. A statement, substantially an inventory, was submitted to the beneficiaries under the will, or most of them, on July 16, 1952, after the funeral of the deceased testator. So a statement, substantially an inventory, was embodied in the petition to have the will admitted to probate. Furthermore, the testimony shows that an action for damages involving a claim for some $170,000 was pending just prior to the time the inventory was filed, making it somewhat difficult to file a minute inventory before that time. We think the foregoing contention is without merit. See Clancy v. McElroy, 30 Wash, 567, 70 P. 1095; Willoughby v. Willoughby, 203 Ala. 138, 82 So. 168; In re Graber's Estate, 111 Cal. 432, 44 P. 165; 21 Am.Jur. 450.

Section 6-2010 W.C.S. 1945, provides that executors and administrators must file their accounts six months after their appointment. It does not appear that any request for an accounting was made, nor does it appear that any harm resulted because of the failure of the executors in this case. So the objection in this connection is unsubstantial, and not a cause for removal. In

re Johnson's Estate, 178 Or. 214, 164 P.2d 886; In re Stewart's Estate, 145 Or. 460, 28 P.2d 642, 91 A.L.R. 818. It is probably not a mere conjecture when we say that if the failure herein mentioned is cause for removal of the executors, half of the executors and administrators in this state should be removed. The contention made herein may serve as a warning in the future.

Section 6-1007 W.C.S. 1945, provides that if two or more persons are appointed executors or administrators a separate bond *must be required* from each. Note the italicized words. The failure in this case, if it was a failure, was the failure of the clerk of court who approved the one bond, signed by a surety company, filed by the executors herein. The bond is a joint and several bond and there is some doubt that there was a violation of the statute. The statute was passed in the days when surety companies were not known. In any event the statutes make ample provisions for additional bonds. §§ 6-1009 to 6-1012. So far no one has made application for any such additional bond, except indirectly in this collateral action.

Objection is also made that the executors did not invest the amount of money on hand, which was the sum of $120,000, and a larger amount subsequently. The executors say they accumulated that sum to be prepared to pay the federal estate taxes in the amount of over $200,000. That would seem to be a sufficient excuse. Furthermore Robert Bible testified that if the executors had invested the amount of money on hand in Government bonds, they would have lost money. Anyone at all familiar with the erratic market in Government bonds in 1953 and 1954 knows that to be true or at least probable.

The amount of money mentioned above was kept on deposit in the First National Bank of Rawlins, Wyo-

ming, of which Robert Bible and Clarence Brimmer are officers. It is the contention that this amount of money should have been given preferred status in the bank. Perhaps that would have been wise. However, it is not shown that the bank is not fully solvent. Furthermore, if any loss had occurred by reason of the deposit in the First National Bank, Bible and Brimmer would have been liable on their bond which was for over a million dollars and was a much better protection than if the money had been given a preferred status in the bank.

In conclusion we think the foregoing objections are so unsubstantial that they give no cause for the removal of the executors in this case.

B. Hostilities.

Counsel contend the executors herein should be removed because of the hostility existing between them and the respondents. It is held the hostility must be of such a character as to prevent proper management of the estate. 33 C.J.S. 1033. Hostility to the will is no ground for removing trustees. 90 C.J.S. 189. The same rule should prevail in the case of executors. Mere friction is not grounds for removing trustees. Restatement of Trusts, § 107; 54 Am.Jur. 112.

Counsel for respondents refer to the fact that Bible made Mrs. Hartt angry because he let her son-in-law have some of the stock in some of the sheep companies involved herein. Bible bought the stock from Spragg, the brother of Mrs. Hartt, and distributed that stock to his co-executor and Charles Higley, Mrs. Hartt's son-in-law. Mrs. Hartt testified this made her angry, in view of the fact that she did not like Higley and furthermore indicated that the estate should have had an opportunity to buy this stock. The stock cost $300 and $200 a share. In the first place she should have been glad that those working for the companies should

want to buy the stock in order to give them an incentive to work for the interest of the companies, the stock of which was controlled by the estate. That is the rule followed by many or most corporations. No reason existed for her becoming angry. Mrs. Hartt testified that she got over her anger in a few days until she later thought about it. We cannot imagine what revived her anger unless it was that later she decided to try and nullify the will and kept up her anger for the purpose of having some grounds for removal of the executors herein. Even that is not understandable in view of the fact that she then wanted to liquidate the sheep companies. In short we find no merit in the contention that these matters were any legitimate cause for hostility and hence for removing the executors.

Another matter mentioned by counsel for respondents as grounds for hostility is that Bible kept the key to the deposit box in the bank which had been rented in the name of the testator and Mrs. Hartt. But the latter had a whole year and more to ask for this key but she never asked for it until she was evidently advised that she could claim all of the contents of the box which contained the bulk of the property belonging to the estate. See Hartt v. Brimmer, Wyo. ,287 P.2d 638. Had it not been for the stamped statement on the agreement to hire the box—made, as mentioned in the foregoing case, mainly for the protection of the bank—Bible and Brimmer would have been entitled to the key to the box as representatives of the testator as much so as Mrs. Hartt. We are somewhat surprised that this matter should even be mentioned by counsel for the respondents as a cause of hostility and hence for the removal of the executors.

Pearl Holmquist, daughter of Mrs. Hartt, testified that she did not agree with the way her father wrote

his will. Her chief complaint was making them wait eight years, which she said was wrong. Mrs. Mitchell, another daughter, testified that she felt her father's will was not fair to the family, particularly in having the daughters wait eight years after Mrs. Hartt's death before they could get the principal of the estate. Dorothy Okey, another daughter, testified to the same effect. Mrs. Hartt, herself, testified she wanted the will disrupted because then she could make some gifts to her daughters. This clearly shows the main hostility was to the will itself, which, as we see it, is no ground for removing the excutors. 90 C.J.S. 189. The hostility against the latter in the main accordingly was because they wanted to uphold the provisions of the will. The most effective method of disrupting the will was to get rid of the main defenders of the will and one cannot help but wonder if one of the reasons for instituting the action here considered was to get rid of these defenders or cause them to desist from the opposition to the main purpose mentioned. In any event, counsel for respondents in their brief assert as grounds of hostility towards the executors that they failed to advise the widow of her rights of dissenting from the will. We have heretofore considered that, ruling against that contention. We might add that counsel say the executors should have advised respondents that the trust would be accelerated by the widow dissenting from the will. We think we are not far wrong in saying there is probably not a single lawyer in the state who, not having had special occasion to look up the matter, knows anything about the rule, but counsel, in order to have the defenders of the will removed, point an accusing finger of guilt at them in this connection. We think they protest too much.

It is further claimed that it was the duty of the executors to inform Mrs. Hartt and the respondents

of the rights of the widow and of other matters because of the fact that they relied on the executors and trusted them. It may be noted that most of the reliance was on Robert Bible, who, while knowing some legal lore, is in the main a banker. Respondents paid little or no attention to Clarence Brimmer, whose profession is that of a lawyer. The daughters are apparently all college-bred and highly intelligent, so we may fairly infer that their mother, too, was intelligent. They all admitted that when they asked either of the executors anything, the information for which they asked was promptly supplied, and that when they asked the executors to do anything which was in their power, it was done. To hold that college-bred women or women of reasonable intelligence can blindly rely and depend on another without making any effort whatever to find out things for themselves is not too safe a rule to lay down for the conduct of men and women. In 1 Restatement of the Law of Trusts, § 173d, it is stated: "Ordinarily the trustee is not under a duty to the beneficiary to furnish information to him in the absence of a request for such information." It would seem a similar rule should apply to executors, unless, perhaps, under exceptional circumstances. It ought not to be too easy to trump up as an afterthought a charge that some information should have been furnished, when the records in the case would easily have furnished such information.

It is further claimed that the executors did not have the privilege or right to resist Mrs. Hartt's dissent from the will, and that because of such conduct hostility exists. That doubtless is true, and we could readily agree that if the executors had no right to resist the attempts of Mrs. Hartt to dissent from the will after the expiration of the time fixed by statute, then there would be sufficient grounds for the removal of the executors. It is contended in this connection that

the executors are not authorized to employ counsel except in connection with a contest of the will, presumably inferring that they have no right to oppose a dissent of the widow from the will, and it is claimed that such dissent merely involves the distribution of the estate and nothing more. Counsel cite no cases in point. The same matter is involved in the contention later mentioned that the executors have no appealable interest. This matter seems to be the main ground, aside from salaries hereinafter mentioned, for the removal of the executors herein. The point here involved is of vital importance. In Yeager v. Yeager, 155 Kan. 734, 129 P.2d 242, 243, the court said: "Our forthright decisions, * * * have held that any action whose plain and essential purpose is to get rid of a will—to effect a result contrary to the obvious intent of the testator—is an action 'to contest' the will." In Willson v. Whitehead, 181 Va. 960, 27 S.E.2d 213, it was held that trustees must defend all suits against them with respect to the subject of the trust. In Tuttle v. Union Bank and Trust Co., 112 Mont. 568, 119 P.2d 884, 139 A.L.R. 127, the court held it is the duty of a trustee reasonably to defend any suit which will affect the trust estate, regardless of whether the trustee has any personal pecuniary interest in the outcome thereof. In Republic Nat. Bank & Trust Co. v. Bruce, 130 Tex. 136, 105 S.W.2d 882, the court held it is the absolute and positive duty imposed on a trustee to defend the life of the trust whenever it is assailed. In re Riviere's Estate, 8 Cal.App. 773, 98 P. 46, the court stated that the confidence reposed in an executor would be abused and he would prove recreant to his trust even in the face of contests, if he did not diligently endeavor to carry out the wishes of the testator. In re Logan's Estate, 171 Cal. 357, 153 P. 388, 390, the court stated: "When a will is admitted to probate it is the duty of the executor to defend and uphold the will against any

subsequent attack for its revocation made upon it, * * * and this duty primarily rests upon the executor, and not upon the legatees or devisees." It is accordingly quite clear that hostility engendered in that manner cannot be a cause for removal of the executors unless we are willing to hold that the executors have no duty as mentioned in the foregoing authorities.

C. Conflicting Interests.

It is contended that there exists such a conflict of interests between the executors and respondents as to require the removal of the executors. It is undoubtedly the rule that a trustee must not place himself in a position where his interest may conflict with his duty, and that he cannot place himself in a position where he gains any individual advantage except what the law gives him. In re Jones' Will, 124 N.Y.S.2d 672, 679, and cases cited. We shall deal with this point more fully later. The question is in what respect the interests of the executors conflict with their duties and what interest the law gives them. One of these conflicts is claimed to exist because respondents wanted to have the sheep companies liquidated and the proceeds invested in a different form, and Bible did not agree. There is something ironic in this claim. Just three months before this action was instituted Mrs. Hartt thought so highly of these companies that she became angry because a few shares of stock came into the hands of Bible and Brimmer and her son-in-law. In three months, she changed her mind, on the advice of counsel who, just as the members of this court, know probably less than half as much on the subject as did Robert Bible with his large experience. We do not say counsel were wrong. It is not at all improbable they were right, provided that no precipitate action is taken to bring about the result, since no ready buyers may be found. Precipitate action might be disastrous to the

estate. That Bible did not agree to liquidation is no cause at all for the removal of the executors. The will gives them the right to keep the sheep companies going. In any event whether the sheep companies should be liquidated or not, or whether the shares of stock therein should be sold should not be determined in this collateral action. It should be determined in an orderly way pursuant to a petition to the court, and an order made after hearing competent and disinterested witnesses. There is no cause to believe, so far as we can see, that the executors would disobey an order of the court duly made, and would not use all efforts to liquidate the companies if that is deemed advisable.

Aside from the matter of salaries which we shall discuss later, we fail to perceive any conflict of interests other than those which in the nature of things arises when respondents want to invalidate the will as nearly as possible and when the executors want to uphold the provisions of the will. It is this combination —one side wants to destroy and the other side wants to preserve—which distinguishes the case before us from all other cases cited by respondents and which to a more or less extent affects every contention made herein by respondents. It is quite clear that a conflict arising under such conditions cannot be a conflict that gives rise to the right of removal of the executors. True, executors and trustees receive fees, generally proportionate to the amount and to the duties involved. Should the will be nullified to the extent wanted by respondents, the fees as trustees would be less than if the will stands as written. So we come back to the same question several times mentioned as to whether the will should stand or not.

D. Salaries.

One of the main questions arises herein in connection with salaries which the executors voted them-

selves in three sheep companies which were controlled by the testator. The Yellowstone Sheep Company has 6000 shares of stock of which the estate of John K. Hartt owns 3148 shares, or 52.46% of the total shares. It owns 17,000 acres of deeded land, and had an allotment, presumably under the Taylor Grazing Act, of 3½ townships, and operates in the main in Fremont county, Wyoming. It ran about 1800 head of cattle and about 7000 to 8000 head of sheep. The Cow Creek and Pioneer companies were run together and in the main, it appears in Carbon county in this state. Each had 600 shares of stock. The estate of John K. Hartt, deceased, owns 363 shares or 60.5% of the total shares of the Cow Creek Sheep Company and 313 shares or 52.1% of the total shares in the Pioneer Sheep Company. These companies own about 50,000 acres of deeded land and hold about 44,000 acres of leased land and ran 21,000 to 22,000 head of sheep. The volume of business done by these companies is not shown, but it must have been large. It is admitted in the pleadings that Hartt during his lifetime drew a salary of $6,000 as president of the Yellowstone Sheep Company; $4,000 as president of the Cow Creek Sheep Company and $1,500 as an officer of the Pioneer Sheep Company. It is also admitted that Robert Bible was, during the testator's lifetime, secretary-treasurer of the Yellowstone Sheep Company at a salary of $2,400 and treasurer of the Pioneer Sheep Company at a salary of $1,000. It also appears that Clarence A. Brimmer was for many years counselor and advisor of the testator and of the sheep companies. There is testimony that he was connected with part of the sheep companies as an officer. But that is not clear. The total salaries drawn by the testator during his lifetime and others in the sheep companies were $18,600. After the death of the testator, the executors voted themselves a salary as president, the same salaries which the testa-

tor had drawn as such officer. The total salaries voted to themselves, to one Walter E. Cosgriff, as assistant secretary, and to C. A. Brimmer, Jr., as assistant secretary and assistant treasurer, were $21,400 or $2,800 more than the salaries paid during the testator's lifetime, a difference probably very small compared with the volume of business done. The difference lies mainly in the salary voted to C. A. Brimmer, Jr., of $900, as assistant secretary, and salaries voted to C. A. Brimmer as vice president, when no such salraies had been paid previously. There is testimony that Mrs. Hartt was informed of the salaries, but she denied it. The executors owned a few shares of stock in these sheep companies. That seems to have no bearing in this case except that they contributed their proportionate share to their own salaries. It must be borne in mind that so far as the estate is concerned, it contributed only a little over one half of the total salaries paid, and it would, of course, be just that the minority stockholders should contribute their proper share. There is no testimony in the record that the salaries paid to the executors herein were excessive. The only testimony in the record is to the contrary.

Respondents claim that under the foregoing facts the court was justified in removing the executors and trustees, and that we have no right to interfere with the court's discretion. They rely on the general rule that executors and trustees must not place themselves i na position of conflict of interests, and they especially cite the cases of In re Hirsch's Estate, 116 App.Div. 367, 101 N.Y.S. 893; Pyle v. Pyle, 137 App.Div. 568, 122 N.Y.S. 256, affirmed 199 N.Y. 538, 92 N.E. 1099; In re Kirkman's Estate, 143 Misc.Rep. 342, 256 N.Y.S. 495; In re Grossman's Estate, 157 Misc. 164, 283 N.Y.S. 323. The facts in these cases were, of course, different from the facts in this case, and we cannot take the space to analyze them. It is true that excerpts

contained in these cases indicate that removal of executors in the case at bar was justified. It may be that some appellate courts would sustain the action of the trial court herein even under the facts in this case, although we doubt it. The sound rule undoubtedly is that whether or not there is cause for removal depends on the facts and circumstances in each case. In re Goldner's Will, 115 N.Y.S.2d 104; In re 'Keyston's Estate, 102 Cal.App.2d 223, 227 P.2d 17, 21; In re Brown's Estate, 22 Cal.App.2d 480, 71 P.2d 345. It was held in In re Berri, 130 Misc.Rep. 527, 224 N.Y.S. 466, 472, 473, that the acceptance of salary by a trustee in a corporation, the stock of which was held by the estate, did not of itself justify the trustee's removal. In that case, it was objected that the executor should not have allowed himself to be elected as a salaried president of the corporation. The court pointed out that some one had to be elected, and stated among other things:

"While it is true that ordinarily the commissions allowed by law are deemed to be full compensation for the performance of services as a trustee, this is not an inflexible rule. Where a trustee renders services outside of his duties as trustee, he is entitled to fair compensation for the services rendered to the estate. It was so held in the case of Lent v. Howard, 89 N.Y. 169, and in Russell v. Hilton, 37 Misc. Rep. 642, 76 N.Y.S. 233. In the latter case the opinion was written by Mr. Justice Scott, and it was then stated that, if the executor in that case had not devoted his time to the duties for which it was sought to compensate him, it would have been necessary to have employed some one else to perform them, and the compensation of the person so employed would have been a legitimate charge against the estate."

In reGerbereaux' Will, 148 Misc. 461, 266 N.Y.S. 134, 145, the same objection was made. The court held that the internal management of a corporation by a director whose responsibility as executor or testamentary

trustee to estate possessing stock therein in questioned, ma ybe scanned to determine whether the acts resulted in depreciation of the stock of the estate, and if they *willfully* abuse their trust, they will be held liable to the estate. The court stated further:

"I do not believe such pay for services rendered as officers of the corporation, upon the volume of business transacted, amounts to a misuse or spoliation and waste of corporate property, nor do I believe that it diminished the value of the stock held by the trust. It did not amount to a devastavit to create such a personal interest in them as to conflict with their duties as trustees. The facts are entirely dissimilar to those in Matter of Auditore's Will, (249 N.Y. 335, 164 N.E. 242) and Matter of Kirkman's Estate, 143 Misc. 342, 256 N.Y.S. 495."

In re Goldner's Will, 115 N.Y.S. 104, 106, 107, a trustee, a woman, had worked for the corporation in which the estate had some stock, receiving a salary. After becoming a trustee, she continued the same work and received the same salary. The court stated:

"The Special Guardian contends that the roles of the respondent as trustee and as employee of the corporation are in such conflict that she must relinquish either the trusteeship or the Secretaryship. A fiduciary relationship requires the administration of the trust in the sole interest of the beneficiaries and that the trustee refrain from placing himself in a position where his personal interests will conflict with those of the cestuis que trust. This guiding principle does not necessarily prohibit, however, individual participation by a fiduciary in all transactions in which the trust estate also has an interest. It frequently happens, as in the instant case, that the trustee is an officer or director of a corporation in which the trust estate holds a stock interest. Whether the trustee is accountable to the trust for any salary which he may receive or that his acts constitute a proper basis for removal depends upon the circumstances in each case. Moreover, the rule that commissions allowed by law are deemed to be full compensation for the performance of services by a fiduciary is

not an inflexible one. Matter of Berri, 130 Misc. 527, 224 N.Y.S. 466. An examination of the authorities shows ample precedent to sustain the continuance of the dual roles occupied by the respondent trustee. Matter of Berri, supra; Matter of Gerbereaux, 148 Misc. 461, 266 N.Y.S. 134."

We shall not quote from other cases involving the same principle, although, of course, under different facts a similar result was reached in In re Brown's Estate, 22 Cal.App.2d 480, 71 P.2d 345; In re Keyston's Estate, 102 Cal.App.2d 223, 227 P.2d 17; Shirk v. Walker, 298 Mass. 251, 10 N.E.2d 192, 125 A.L.R. 620; In re Meyrowitz' Estate, 108 N.Y.S.2d 275; In re Block's Will, 60 N.Y.S.2d 639.

Respondents admit that some person or persons were to be elected to serve as officers of the corporation. But counsel say it was not necessary for Bible and Brimmer to elect themselves or to vote themselves a salary after being elected. There may be some doubt as to how far that is true, in view of the fact that the estate held a controlling interest and it was the duty of the executors to protect it. But if we concede the statement of respondents to be correct, that does not get us far. It simply leaves us at a dead end. Counsel do not point out a better course which should have been pursued. Should the executors have elected someone else at the same, at a larger, or at a lesser salary? Counsel are silent. The burden of proof of facts which would warrant the removal of the executors and trustees was on respondents. We do not know that there was a single individaul who was competent, available and willing to take these official positions, or at what salary. So far as the record shows, Bible and Brimmer were the only parties competent, available and willing to serve in the capacity above mentioned. Counsel for respondents state in their brief (p.207) : "We are not unmindful of the fact that John K. Hartt

named C. A. Brimmer and Robert Bible as Trustees, and that *perhaps* in doing so the testator knew that control of the three sheep companies would be vested in them." We think the word "perhaps" in the foregoing statement should be stricken. The companies were close corporations. Not too many persons are available and willing to assume the duties performed by the testator during his lifetime. Bible and Brimmer, as the testimony shows, had a great deal of experience in connection with sheep companies. The testator directed that his executors could continue to keep the sheep companies running. Bible and Brimmer were for many years his trusted and tried friends, associates, counselors and advisors. He even trusted Bible to the extent of loaning him $37,000. It is, we think, almost a certainty that the testator expected Bible and Brimmer to occupy the chief official positions in the companies. And that the testator expected, as anyone else would expect, that they should have *some* compensation in *some* form is an equal certainty, if we are any judge of human conduct at all. We hardly think a court should disregard these certainties, or near-certainties. The only question then left is in what form and in what amount the compensation should be made. That matter is in the control of the court. It can fix and determine and adjust the matter easily and so protect the beneficiaries. In this case a final accounting is yet to be made and a hearing thereon had. The executors have requested the court to take the salaries paid them into consideration in fixing their fees in the final accounting. That they made the request after the action herein was filed makes no difference. It follows as a matter of law that the court not only would but should take these salaries into consideration when their fees are fixed and determined. There is no indication that when it is done, respondents will be harmed in any way. As we have seen the re-

moval of an executor or trustee is harsh and severe; it is serious ;it is a drastic action; it should not be done unless clearly necessary; if the court can adjust the disputed matters, the removal should not be made; an executor or trustee should not be removed except for gross and willful misconduct. If these rules are of any value at all, if they are worth more than the paper on which they are written, then, clearly, the facts in this case do not justify the removal of the executors in this case for the sole reason that they received salaries as above mentioned. Indeed it seems that even respondents do not claim that that fact alone would justify the removal, but that it was justified for that reason in connection with other factors heretofore discussed. These factors, as we have seen form no basis for the removal, and the combination is no stronger than its weakest link. The whole matter of salaries, if that was in fact a matter of serious objection by respondents, could have been easily adjusted by the very simple method of respondents filing their objections thereto, and asking the court to pass upon them, instead of taking the drastic method pursued in this case. Let us go a little further. Suppose the president of a bank holds control of the stock in a bank and draws a salary of $6,000 per annum. He dies and leaves the stock in trust to his son, also connected with the bank, to pay the income from the stock to the banker's widow, etc., similar to the provisions in the case at bar. The son uses the stock to vote himself in as president at an equal salary to that of his father. Is there anyone or any court that would say the son, on that account, was guilty of gross or willful misconduct warranting his removal from his position in the bank? We think not. Substitute for the son, the tried and trusted friends, counselors and advisors of the testator, who might be closer to him than a son would be, should a different result be reached? We doubt it. While at times con-

flicting interests alone justify the removal of executors, we must be able to say under the facts herein that they were guilty of gross and willful misconduct to justify their removal. Their honesty and integrity is not questioned either by respondents or the trial court. Much as we would like to defer to the judgment of the trial court, we have, after searching our conscience for many days, been unable to characterize their conduct as willful and gross misconduct. To say Brimmer and Bible are incompetent to manage the estate is, in view of their experience, simply not true. Counsel say the term incompetent means unsuitable. But, aside from the matter of salaries which we have already discussed, the only possible reason for that would be because they insisted on upholding the testator's wishes. That, as we have seen, is not a legitimate reason for removing them. To hold that it is, would simply mean that we would encourage casting aside a testator's will. That we think would be against public policy and we are not prepared to violate that policy, even if the feelings of respondents are left in an unfortunately unhappy state. We regret that, of course, as much as respondents, but is it comparatively unimportant when measured by the importance of upholding the principle involved.

We cannot, however, dismiss this subject without further consideration. It is elementary law, we think, that an executor or trustee, acting in a fiduciary capacity, cannot be permitted to fix and determine his own compensation. At common law he was not entitled to any at all. In re Popp, 107 N.Y.S. 277; 90 C.J.S. 719. A will may contain provisions in connection therewith, or a statute may fix it, but aside from such provisions the compensation must be fixed by the court, or at least pursuant to the consent of the beneficiaries under the will. 34 C.J.S. § 856, pp. 1011, 1012; 2 Bancroft's Probate Practice, 2dEd., § 423; 90 C.J.S. § 396, p. 719; 4 Schouler on Wills, Executors and Administrators,

6th Ed., & 3029. It is not absolutely necessary that the compensation, even if extra compensation, be fixed before actual payment. Schouler, supra. As we have seen the court may approve the compensation after payment, but in a case such as before us, it is far safer to consult the court beforehand, rather than hope for a subsequent approval, and in the meantime face the demand for removal. It seldom happens, at least in this state, that an executor does or may occupy a dual role, and the executors in this case evidently did not realize that the rule above mentioned applies when the executor receives a salary from a corporation in which the estate holds stock. But careful consideration or reading the cases on the subject discloses that it should apply in such a case. The corporate entity is not so distinct but that the court may inquire into the compensation of an executor who controls the corporation by virtue of the stock held by the estate in the corporation. In re Gerbereux' Will, 148 Misc. 461, 266 N.Y.S. 134. In the case of In re Flood's Estate, 230 N.Y.S. 774, 777, a woman, before being appointed executrix received an allowance of $75 per month for the care of the decedent while living. When she became executrix, she became a party to raising the compensation to $100. The court, reducing the compensation, stated:

"Any attempt to enlarge the amount originally fixed should have been the subject of an application to this court. Section 212, Surrogate's Court Act. The payment of additional compensation for individual services rendered by an executor or trustee is discouraged to the greatest degree by the courts. Where extraordinary personal services outside of the trust duties are rendered, compensation has s o m e t i m e s been allowed, but the right to payment and the amount thereof have always been the subject of the strictest judicial scrutiny. This rule has been based upon the adversity of interest in the same person between his capacity as trustee an dhis capacity as a paid employee.

The temptation to exact excessive or unauthorized pay is too great to permit the representative to fix his or her own compensation. In his comprehensive opinion in Matter of Popp, 123 App.Div.2, 107 N.Y.S. 277, Justice Gaynor reviewed the authorities applicable to this question. He pointed out the importance of the rule of strict scrutiny in the allowance of extra compensation and the intolerable abuses which would arise if not properly controlled."

The court in Mangels v. Safe Deposit & Trust Co., 167 Md. 290, 173 A. 191, 197, 198, discusses the principle here involved fully, citing many authorities and holding that it is a most salutary principle that a trustee, or one acting in a fiduciary capacity, is not permitted to place himself in such a position that his own and the interest of the beneficiary come in conflict. In that case, Mr. Tippett, as trustee, controlled 50% of the stock in a corporation and drew a salary with the consent of the one who controlled the other 50%. The court in concluding its discussion stated as follows:

"The question in this case is: Does the record show a state of facts which violates this firmly established doctrine? It is fair and just to say that this record is barren of evidence showing bad motive, or any willful purpose to deplete or injure the trust estate. But Mr. Tippett has placed himself in a position which, if occupie dby one acutuated by evil, selfish, or malignant purposes, could result in personal profit at the expense of the beneficiary. By virtue of the stock belonging to the estate, and held by himself and his cotrustee, he is elected a director of the corporation. It is apparent that the management of the corporation is within the control of two directors, Mr. Herold representing one half of the stock, and Mr. Tippett the other half; and it is true that his position as secretary at a salary of $50 a week is dependent upon his directorship, growing out of the trustee-ownership of the stock. It is no concern whether or not the services rendered be fully worth the salary received. It still remains true that that personal benefit to him is derived by virtue of his trusteeship. There can be no question that the net

return to the estate is lessened by one-half of the amount of the salary received by Mr. Tippett as secretary; and he is in a situation, as trustee, to use such position for personal gain at the expense of the estate. We find no evidence in this recrod which indicates that his services as secretary have been overpaid, or that any other person occupying that position would not be entitled to and receive as much or more salary. But, as stated, this can have no influence upon the application of the principle here invoked. He might as easily have demanded and received a very much larger salary, in return for voting an unreasonable salary to Mr. Herold, the president and treasurer; and it is apparent that his self-interest and the interest of the estate which he represents as trustee may conflict, to the detriment of the estate. We desire to make it clear that we find no evil intention, purpose, or design on the part of Mr. Tippett; but the facts show a case governed by the principle laid down by the authorities, and, if that is to be maintained in its full force and integrity, we feel compelled to apply it to the present facts.

\*       \*       \*       \*

"Our conclusion upon the whole case is that there is no violation of this principle in a trustee holding stock in a corporation, preventing him from becoming a director therein, but that he should not become a salaried officer or employee of the corporation, that the record does not call for or warrant a removal of Mr. Tippett as trustee, but that the appellant is entitled to an accounting of the salary received by Mr. Tippett as secretary of the corporation from the time he was first so appointed, and the payment of one-half of such an amount so found to the appellant, without interest."

At first blush we thought the rule of that case might well be applied in the case at bar. However, we do not know the amount of business done by the sheep companies or the financial condition of the corporations which should be taken into consideration, as to what, if any salaries, should be paid. We do not know whether or not the compensation fixed by statute for the executors in this case is disproportionately small as com-

pared with the amount of time spent and labor done by the executors in this case. So we have concluded that the whole matter should be left in the hands of the trial court. It may take into consideration in settling the matter the salary paid to C. A. Brimmer, Jr., as assistant secretary of the sheep companies and should take into consideration the amounts paid Bible and Brimmer during the testator's lifetime.

We are not satisfied with the broad statement in the foregoing case that a trustee should never become a salaried officer in a corporation in which the trust has stock, especially when the corporation is controlled by the stock held in trust. Several of the cases already cited indicate that that should not be a general rule. It might be true in some cases. But the corporations here involved are sheep companies demanding large attention and the evidence in this case indicates that both of the executors have had large experience with livestock companies, and unless more competent men than they can be found and at lesser salary, the rule for the foregoing case should not apply, although as heretofore indicated, whatever salaries they receive should be fixed and determined by the court, and not be left to the trustees' discretion. The court can thus fully protect the estate and the trust. As shown before, the undoubted intention of the testator was that Bible and Brimmer should have control of the sheep companies and that they should be compensated in some form.

III. Right To Appeal.

It is contended herein that the order allowing the widow to elect after the statutory time is not a reviewable order. It is provided by § 6-2710 W.C.S. 1945 that the provisions of the code of civil procedure shall apply to matters in probate. It is said in In re Barrett's

Estate, 22 Wyo. 281, 138 P. 865, 141 P. 95, 97, that "a party has the same right to appeal from a judgment or final order of the district court in probate matters as in civil actions * * * unless as to a particular matter he is deprived of that right by some express provision of the statute." There is no such express provision as relating to the matters herein involved. We have then express statutory authority that the matters herein involved may be appealed, provided that they constitute a final order affecting a substantial right according to the provisions of § 3-5301 W.C.S. 1945, and this statutory authority is just as explicit as counsel say exists, for instance, under the California Statute. Respondents claim that the widow's election to take against the will merely affects the distribution of the estate in which the executors and trustees are not interested. Counsel for the appellants claim that the widow's election after the statutory time is equivalent to a contest of a will, and respondents agree that a judgment in a contest is appealable. We think we must agree with counsel for appellants. We have heretofore quoted from Yeager v. Yeager, 155 Kan. 734, 129 P.2d 242, 243, that "any action whose plain and essential purpose is to get rid of the will, —to effect a result contrary to the obvious intent of the testator— is an action 'to contest' the will." While the facts involved in that case were different from those in this case, the principle stated clearly is sound and correct. In 6 A.L.R.2d 152, the annotation states:

"Where the order or judgment affects or threatens the very existence, validity, or continuance of the trust, or prevents the trustee from discharging his duties under the trust, or threatens to defeat the purpose of the trust, or depletes the trust fund by allowance of unreasonable or unfound claims against it, the trustee, though having no personal interest in the litigation, is not a disinterested party. In such case he, in his fiduciary or representative capacity, is aggrieved by the

judgment or order, and may appeal therefrom, whether the litigation is between the beneficiaries themselves or between the trust and third parties."

The principle stated should apply even while the estate is still in the hands of the executor. To hold that the trial court may, in disregard of our statute, permit a widow to dissent from the will almost at any time, and make that court the court of final resort in such cases, without right of appeal to this court, would, we think, be a rather startling rule. Mrs. Hartt did not raise the point in the trial court that the executors had no right to contest her petition to dissent from the will after the statutory time. Furthermore we have held that it was not only the privilege and right of executors to resist her petition, but that it was their duty to do so, and thus protect the will and wishes of the testator. If that is true in the trial court, it would seem to follow as a matter of law that it is equally true in the appellate court. See Annotation, 6 A.L.R. 147. Such election by the widow, after the time provided by statute involves, it is true, a final distribution of the estate, but it involves much more than that, namely the validity and the effect of the will. The fact that no objection would have been available, if the widow had elected to dissent from the will within the time required by statute, is beside the point. When that time has expired then, says the statute, the will is in effect as written, and the testator, through his representatives, has the right to have the will upheld, and should not be bound by the action of the trial court as a court of final resort.

It is also contended that the order of removal of the appellants as executors and trustees is not appealable, for the reason that their interest is not such as affects them adversely. A partial annotation on the subject is contained in 140 A.L.R. 808 and a more complete annotation in 37 A.L.R.2d 751. These annotations show an irreconcilable conflict in the authorities on

substantially every point argued by the respective counsel herein. Looking over the subject generally, it would seem that we are meeting a lot of technical procedural matters. We had thought that we were living in an era in which technical procedural matters are not favored. But perhaps we are wrong. There are conflicting authorities, for instance, on whether an appeal, assuming that it is allowable, should be made in a fiduciary capacity or an individual. Annotation, 37 A.L.R.2d 795. It is quite clear that Bible and Brimmer are adversely affected both in their fiduciary capacity and in their individual capacity, and the adverse effect would seem to be alike, or at least similar. Indiana, holding that the appeal must be in the individual capacity, yet holds that when the name of the individual is followed by guardian, executor ,etc., that is merely descriptive personae. Sibley v. Lewis, 117 Ind. 655, 75 N.E.2d 420; Weiland v. Scheuch, 123 Ind. 633, 109 N.E.2d 618. Again we meet with the question as to whether or not the appeal, especially if a stay is directed, as in the case at bar, suspends the judgment of removal. § 12, Annotation, 37 A.L.R.2d 800. The authorities are in hopeless conflict, some cases holding that the order of removal made by the trial court is not vacated by the appeal. That would seem to be in accord with the general rule stated in 4 C.J.S. 1150. Yet in 4 C.J.S. 1096, it is held that the order of the trial court is suspended, and that would be particularly true when, as in the case at bar, an order for a stay is, and must be granted in accordance with the provisions of § 3-5310 W.C.S. 1945. It was granted in the case at bar. See in that connection State ex rel Huber v. Tazwell, 132 Or. 122, 283 P. 745. So far as the actual appeal is concerned there seems to be little difference, whether the order stays in effect or whether it is merely suspended, although there might be a difference in connection with collateral m a t t e r s, for instance,

whether the court was authorized to appoint a special administrator in this case.

In some of the cases a distinction is made between the removal of an executor and administrator. See State ex rel Huber v. Tazwell, supra. In Hartford Nat. Bank & Trust Co. v. Malcolm-Smith, 129 Conn. 67, 26 A.2d 234, 140 A.L.R. 805, 807, the court, speaking of the removal of a trustee stated in part that he must have a pecuniary interest in the appeal. "A grievance to his feelings of propriety or sense of justice is not such a grievance as gives him a right of appeal." The annotator at page 808, 140 A.L.R., on the contrary states:

"There would seem to be reasonable ground for the view that the act of a decedent in designating a particular person as executor or trustee, when duly assented to and when made effectual by judicial appointment, becomes the foundation of a peculiar obligation personally to administer the will or trust and to maintain the right to do so in the courts, and that consequently the interest of the appointed person in so doing should not be regarded as purely sentimental. Surely, the concern of the decedent in designating the trusted person to act with reference to property matters could not be described as nonpecuniary."

That statement is, we think, sound, and meets with the approval of this court.

Numerous cases hold that an order removing an executor or other fiduciary may be appealed. See Annotation, 37 A.L.R.2d § 7, p. 770. So too, it is held in many cases that a fiduciary has the right to appeal. Annotation, 37 A.L.R.2d § 10, p. 792. We need mention only a few. In Monroe v. Winn, 16 Wash.2d 497, 133 P.2d 952, it was held that testamentry trustees have such an interest in the subject matter of litigation as entitled them to appeal from an order for their removal. In State ex rel Huber v. Tazkell, 132 Or. 122,

283 P. 745, 746, the court stated, citing many Oregon cases:

"The general rule applicable to the right of an executor or administrator to appeal from a decree revoking letters testamentary or of administration is that ordinarily such an appeal will lie. See 23 C.J. p. 1107. In this state the right of a removed executor or administrator to appeal is well settled. * * * Under these authorities, relator's right to appeal from the decree revoking her appointment as executrix is clear." In re Bellows' Estate, 60 Vt. 224, 14 A. 697, 699, the court stated:

"Had the executor, Sowles, the right to an appeal? The executor of a will is the creation of the testator. The probate court has no power to appointment. The testator alone has this right. The dominion of the property after the testator's death is given the executor. Sabine v. Rounds, 50 Vt. 74. We think the executor has such a right to the property of the estate conferred upon him by the will as gives him the right of an appeal. He has, unless unfit, the legal right to administer the estate. What the rule may be in case of an administrator simply, or one c.t.a., we are not called upon to decide. There was error in dismissing the appeal."

In Bancroft's Probate Practice, 2d Ed., p. 235, the author states that: "An executor has a clear right to have reviewed proceedings removing him from office." Counsel for respondents state that the authorities on which the author relies are not in point. Even if that is true, when an author who has given the subject careful consideration, his opinion is not without some value.

In Hecht v. Carey 13 Wyo. 154 ,78 P. 705, this court reviewed an order removing an executor, and reversed the trial court's order removing him. Counsel for respondents say that the case is not in point because the direct question herein was not involved or raised. That is true, and yet the practice established in that

case, which was in 1904, is to be taken into consideration. In re Barrett's Estate, 22 Wyo. 281, 138 P. 865, 141 P. 95, involved an appeal from an order appointing an administrator. The court holding that the supreme court has a right to review the order on appeal cited Hecht v. Carey, supra, thus coming very close at least in holding that an executor may appeal from an order removing him. In any event the practice established in Hecht v. Carey, supra, has been approved in many other cases, and we do not feel called on to depart from it in this case.

As may be noted, the trial court found that Bible and Brimmer were incompetent to administer the estate of the testator as executors and *trustees*. The removal as trustees could not be made at that time, since the trustees had not yet entered upon their duties as such. So respondents argue that in so far as the order removing Bible and Brimmer as trustees is concerned it is not a final order, and so not appealable. Technically they may be right. But what is the court to do when the proper time comes in the face of its findings? Would it feel itself bound by the finding above mentioned? For us to say nothing about it would leave the matter in a strange and perplexing situation. We think that we should cut the Gordian knot and should hold, as we do hold, that the finding above mentioned is null and void and of no effect.

We might add, briefly, that we see no reason why the right of appeal should not also apply to Marjorie Higley. While she stated half heartedly that she did not care whether her mother elected to take under the will, she also stated that she felt her mother would be better off, if she took under the will. She is interested in having the will stand as written. Furthermore she has as much right to ask to have the estate administered by those in whom she has confidence, as her

sisters have the right to ask that it be administered by some one else. The right should be reciprocal and is, we think, substantial. It might, depending on the circumstances, be the most effective way to protect her interests. At least the contrary cannot be shown. § 6-1211 W.C.S. 1945, provides that when a petition for a removal is filed, the executors may demur or answer, and respondents think that this section does not permit Marjorie Higley to also demur or answer. That statute does not forbid her to also appear, and as stated she should have a right reciprocal to that of her sisters.

IV. Right To Take Under and Against Will.

In one of the causes of action in connection with the suit in equity, the court was asked that the widow be permitted to take her share under the statute of descent and distribution and also to take under the will. The court ruled to the contrary. That was correct. The claims are inconsistent, and there is no merit in that cause of action. Bayes v. Howes, 113 Ky. 465, 68 S.W. 449; Landers v. Landers, 151 Ky. 206, 151 S.W. 386, 390; Schweer v. Schweer, Mo.App., 86 S.W.2d 969, 974; In re Zweig's Will, 145 Misc. 839, 261 N.Y.S. 400, 408; Akin v. Kellogg, 119 N.Y. 441, 23 N.E. 1046, 1047; In re McCutcheon's Estate, 283 Pa. 157, 128 A. 843, 845, and cases cited; West v. West, 105 Kan. 523, 185 P. 4. Moreover we have already held the widow can only take under the will.

The judgment of the court denying the right of Mrs. Hartt to take a distributive share under the statute and also take under the will is affirmed. The judgment permitting the widow to dissent from the will after the statutory time fixed is reversed, and the right to so dissent is denied and her election made after the statutory period is declared void. The judgment of the court removing the executors herein is

388

reversed with direction to reinstate Bible and Brimmer as executors and trustees, with all the rights and duties pertaining to such office under the will of testator, including the right to act as directors of the sheep companies, and make all orders to effectuate what is here stated, and with the following additional directions: The court should determine what amount of salary, in fairness and justice, should be allowed to Bible and Brimmer as salaried officers of the sheep companies here involved, adding that amount, if any, to the statutory fees allowed them for their services as executors, taking into consideration what we have heretofore stated. To these sums should be added any amounts fixed by the court as compensation for any extraordinary services they or their attorneys have been called upon to perform in connection with this estate. If there have been amounts already received by the executors, either as salaries of officers of the sheep companies, as executors or otherwise, such amounts will of course be applied against the amounts to be determined as above and such adjustments made as may be necessary. The court should also fix their salaries, if any, for acting as salaried officials of the sheep companies in the future. The court should make any and all other orders that may be deemed fair, just and necessary within the spirit of what we have herein said.

The executors may think this order leaves their compensation within the mercy of the trial judge. But that is more or less true in every case where the trial court fixes and must fix the compensation. Moreover we have the fullest confidence in the trial judge that, after reading this opinion and after causing such testimony to be produced as may be deemed necessary, and particularly testimony, if possible, of disinterested witnesses, he will make such orders which are fair and just and within the spirit of what we have said.

The costs taxed on this appeal and incurred by the executors in this court must be repaid to them out of the estate of testator. Willson v. Whitehead, 181 Va. 960, 27 S.E.2d 213, and cases cited. No costs, however, will be taxed for the briefs.

*Affirmed in part.*

*Reversed in part.*

HARNSBERGER, J., concurs.